ISAAC GANS

*v.*

ETHEL GANS.

[Decided May 23d, 1910.]

1. A default decree of divorce rendered on service by publication and notice acted on by defendant, a non-resident, who employed an attorney to act, is voidable where the attorney neglected to protect defendant's interests by failing to answer until after the rendition of the decree.

2. Where a wife learning that her husband has obtained a default decree of divorce on the failure of her attorney to defend, first treated with her husband for a money settlement on the basis of the decree, and subsequently affirmed it by a religious act taken at the instance of her family, and finally acted upon it by invoking the law to punish her husband for having cohabited with her out of lawful wedlock, she could not attack the decree and proceed to set the same aside.

3. A default decree of divorce in favor of a husband rendered on service by publication and notice will not be set aside on the ground of public policy merely because the successful party suppressed a written stipulation executed by the parties at the time the wife left the husband, where he almost immediately afterwards repudiated it, and where for some years the wife, with knowledge of the existence of the decree, took no steps to set it aside, until after she had in various ways acted on it as valid.

*Mr. Eugene M. Gregory,* for the petitioner.

*Mr. Isaac F. Goldenhorn,* for the defendant.

STEVENS, V. C.

A decree of divorce in favor of complainant against defendant, Ethel Gans, on the ground of desertion, was made on November 13th, 1902. This decree was entirely regular. Complainant was then a *bona fide* resident of this state. Defendant, prior to the commencement of the suit, had been living with her parents in Boston, and jurisdiction was acquired by publication and notice.

It is admitted that the notice was not only received, but acted upon. Instructions to defend were sent to a lawyer in Jersey City, who, as the evidence now stands, appears to have neglected his client's interests. He mailed an answer to the clerk, he thinks in time, but the record shows that it was not filed until March, 1903; that is, three months after the final decree was rendered. No satisfactory explanation of the apparent neglect is given.

In the spring of 1903 the parties appear to have made up their differences. They lived together as man and wife from that time until September, 1907. The complainant says that before they came together he told his wife that he had obtained a divorce, and that he would marry her again "if she would act right for the period of six months," or, as he otherwise expresses it, "after he had tried her for six months," but that she did not so act. He did, in fact, live with her for four years, and during this period they took and gave deeds as man and wife. The wife testifies, on the contrary, that they occasionally cohabited while his suit was progressing; that he did not tell her that it was going on, and that she did not positively know that the divorce had been obtained until December, 1907, when on an application by her to the police court for support the decree was produced. She admits that she had heard from a lawyer in Elizabeth, in 1903, that he had obtained such a decree, but she says that on calling her husband's attention to the matter, he denied its truth. On this question of notice there is considerable evidence on both sides. Whichever way its weight inclines, it is certain that the wife had definite knowledge of the decree as early as December, 1907. This application was not made until February 15th, 1910. That is over seven years after the decree was made, and over two years after the wife admits that she was fully informed of it.

The affidavits on both sides show that after the second separation, and after the wife's failure to obtain relief in the police court, negotiations were begun for a money settlement. The wife says in her affidavit that she "has been either negotiating with her husband for a settlement or planning as best she could proceedings of some sort against him." She says further,

"the settlement therein mentioned (she is referring to a letter of one Goldstein) and the $1,000 deal, referred not only to the transfer by her of real estate standing in the name of herself and husband jointly, and to a payment of money to her in return for a release of rights she would have as his wife in her husband's real estate, but rights to support as his wife."

During the course of these negotiations the parties went before a rabbi in Boston, where her parents resided, and obtained what is styled a "Jewish divorce." The wife says that she consented to this to please her family. The husband says he obtained it at her request, that she might be free to marry again. This so-called divorce was accorded on July 15th, 1908. It is in Hebrew, and among other things, as translated, it declares that complainant "brought believed witnesses, and he himself signed in his own hand that he had already been long divorced according to law."

Then follows this somewhat remarkable sequence. In August or September, 1908—that is, only a month or two after the Jewish divorce was obtained—the wife went to the prosecuting authorities of Hudson county and applied for a warrant for her husband's arrest on the criminal charge of living with her. A warrant issued, but her husband could not be found. It is difficult to assign any other motive for this extraordinary conduct on her part than that, other expedients failing, she was willing, at any cost of self-respect, to compel Gans to pay her money— money to which she was not, in her then situation, legally entitled.

It appears to me that however willingly the court would, in the beginning, have opened the decree and given the wife an opportunity to be heard, the case as now presented has little to commend it to one's sympathy, and the power of this court should not be strained to advance it.

The wife, as I have said, had full knowledge of the decree in December, 1907. Having such knowledge, it was her duty to act promptly. Decrees of this sort are voidable and not void. *Bish. Mar. & D.* § *753e.* She was not at liberty to take first one position and then another, as she might think the one or the other would best advance her pecuniary interests. It is clear that she has no regard for her husband. In her affidavits she takes pains to blacken his character. So far from avoiding the decree when

she got definite notice of it, she first treated with her husband for a money settlement on the basis of its being in force. Then she affirmed it by a solemn religious act, taken at the instance of her own family; and finally she acted upon it, when she invoked the laws of this state to punish her husband for having cohabited with her out of lawful wedlock. So far as she is concerned, she is not in a position to be heard.

But it is said that the public welfare is involved, and that without reference to the merits or demerits of the parties, the decree should, on grounds of public policy, be opened, because of the deceit practiced upon the court. It has been well said: "Where is litigation to end, if a judgment obtained in an action fought out adversely between two litigants *sui juris* and at arm's length could be set aside by a fresh action on the ground that perjury has been committed in the first action, or that false answers had been given to interrogatories, or a misleading production of documents * * * had been given?" *Flower* v. *Lloyd, 10 Ch. Div. 333.* The lord justice is speaking of a litigated action, but the principle applies to the case in hand. The alleged deceit is said to have been perpetrated by the suppression, by complainant, of a written agreement to separate, executed at the time the wife left her husband. He says it never took effect. I doubt if he is entitled to the fullest credence, but there is this significant fact in connection with what he says on this question. In the agreement it is stipulated that "said Ethel Gans hereby agree to apply for divorce as soon as the law may permit;" and yet we find that within a very short time after the wife went to her parents' home in Boston and commenced suit in the Massachusetts courts, her husband defended and won on the merits. If the agreement became operative in the first instance, it was thus almost immediately repudiated. I do not find anything in the case that, on grounds of public policy, requires the court to disturb this decree entered so long ago. It seems to me that to the situation here presented, the remarks of Chancellor Runyon, in *Nichols* v. *Nichols, 25 N. J. Eq. (10 C. E. Gr.) 60,* are quite applicable: "The object of this bill," he says, "is obviously merely alimony. Public policy does not require the intervention of this court between these parties. It rather forbids."